UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

        Plaintiff,

-v-

MICHAEL BUCANNON, et al.,

        Defendants.

Case No. 3:13-cr-088

Judge Thomas M. Rose

---

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART BUCANNON'S AND HAGGINS' MOTIONS TO SUPPRESS (Docs. 20 and 21); GRANTING IN PART AND DENYING IN PART THE GOVERNMENT'S MOTION TO COMPEL (Doc. #24); AND SUPPRESSING ANY EVIDENCE OBTAINED FROM THE MAY 16, 2013 SEARCH OF THE BLACK GRAND PRIX**

---

Defendants Michael Bucannon ("Bucannon") and Joshua Haggins ("Haggins") were indicted on June 13, 3013, for two Counts of drug trafficking and one Count of possession of a firearm. (Doc. #15.) They both subsequently filed Motions To Suppress. (Docs. #20 and #21.) The Government then filed a Motion To Compel them to first establish standing. (Doc. # 24.)

On October 22, 2013, the Court conducted a hearing (the "Hearing") on both Motions To Suppress and on the Government's Motion To Compel. (Doc. #26.) Following the Hearing, both Bucannon and Haggins submitted supplemental memorandums supporting their Motions To Suppress. (Docs. #31 and #32.) The Government has responded (doc. #33) and Bucannon has replied (doc. #34). The time has run and Haggins has not replied. The Motions are, therefore, ripe for decision.

Both Bucannon and Haggins seek to suppress evidence seized from certain motor vehicles on January 30, 2013, and May 16, 2013. The Government opposes these Motions and

argues that both Bucannon and Haggins must first establish standing to bring their Motions To Suppress.

## FINDINGS OF FACT

Bucannon and Haggins have been indicted on drug trafficking and firearm charges. (Doc. #15.) Their trial is currently scheduled to begin on January 27, 2014.

### January 30, 2013 Search

Neither Bucannon nor Haggins presented any evidence during the Hearing that they have standing to challenge the search on January 30, 2013. (See 10/22/13 Tr. PAGEID 107.) Bucannon did, however, testify regarding standing to challenge the search on May 16, 3013.

### May 16, 2013 Search

On May 16, 2013, Bucannon was driving a black Pontiac Grand Prix that was stopped by the Dayton Police. (Id. at 110.) This vehicle was owned by a Deante Gates ("Gates"). (Id. at 110, 143.) Gates gave Bucannon permission to drive the vehicle to a gasoline station. (Id. at 111.)

On the evening of May 16, 2013, Special Agent Robert M. Buzzard ("Agent Buzzard") of the Federal Bureau of Investigation was operating as part of a task force that was conducting surveillance in the area of Park Hill in Dayton, Ohio. (Id. at 117, 120.) While conducting surveillance, after sunset at about 9:15 p.m., he passed a black Grand Prix that had brake lights on but no head lights on. (Id. at 122.) Agent Buzzard stopped and parked about 100 feet beyond the black Grand Prix. (Id. at 134.) Then, the black Grand Prix started traveling south on Park Hill with its headlights off. (Id. at 122.) The street was not wide enough for three (3) cars, so if another vehicle was coming from one direction and there was a parked vehicle, a vehicle coming from the other direction would have to stop. (Id. at 137.)

-2-

Agent Buzzard radioed Dayton Police Officer Daniel Reynolds ("Officer Reynolds"), who was in the area. (Id. at 123.) Agent Buzzard described his observations and requested assistance. (Id.)

After Agent Buzzard radioed Officer Reynolds and before Officer Reynolds arrived, the black Grand Prix stopped. (Id.) Bucannon, the driver, exited the black Grand Prix and walked across the street to a park. (Id.) Although he saw no stream of urine or any genitals, Agent Buzzard thought Bucannon was urinating in the park. (Id. at 123, 136, 145.) Agent Buzzard relayed this additional information to Officer Reynolds. (Id. at 123.) Agent Buzzard also testified that the front seat passenger in the black Grand Prix that evening was Haggins. (Id.)

In what Agent Buzzard describes as "just a few minutes," Officer Reynolds approached the black Grand Prix from the direction from which the black Grand Prix was facing, turned his overhead emergency lights on and began "dealing" with Bucannon and Haggins. (Id. at 123-24.) Thus, the nose of Officer Reynolds' cruiser was facing the nose of the black Grand Prix, although both vehicles were not in the same lane. (Id. at 138, 150.) Finally, Bucannon had returned to the black Grand Prix before Officer Reynolds arrived. (Id. at 123.)

Officer Reynolds did not immediately get out of his cruiser, and used his loudspeaker to talk to the occupants of the black Grand Prix. (Id. at 139.) Officer Reynolds ordered the occupants of the black Grand Prix to put their hands up and exit their vehicle. (Id. at 140.) There was a pause and then Officer Reynolds exited his cruiser. (Id. at 149.) When Officer Reynolds exited his cruiser and before the occupants of the black Grand Prix exited their vehicle, Officer Reynolds had his gun drawn. (Id. at 140.) There was no discussion about a traffic offense or urinating in the park. (Id. at 140.) Finally, Bucannon and Haggins were not free to leave at that

time. (Id. at 141.)

Officer Reynolds, who had been joined by two (2) other officers, had Bucannon exit the vehicle first and secured him. (Id. at 124, 142.) The officers then ordered Haggins out of the vehicle and secured him. (Id.)

Agent Buzzard approached the black Grand Prix after Bucannon and Haggins were placed in custody. (Id. at 124-25.) Agent Buzzard saw a baggy of heroin gel caps and another baggy of gel caps that were later tested for cocaine. (Id. at 125.) Agent Buzzard did not see a firearm or gel caps in the back seat because he said they had already been removed. (Id.) Finally, although Officer Reynolds told Agent Buzzard that he made the stop because of the alleged traffic offense and public urination, Agent Buzzard was not aware of any ticket that was issued for either public urination or a traffic offense. (Id. at 144-45.)

## RELEVANT LEGAL PROVISIONS

Bucannon and Haggins challenge the January 30, 2013 and May 16, 2013 searches and the Government challenges Bucannon's and Haggins' standing to challenge these searches. The Government also argues that Officer Reynolds had sufficient probable cause to effectuate the traffic stop on May 16, 2013, and that the traffic stop was based upon a reasonable and articulable suspicion that was sufficient to conduct a *Terry* stop. Finally, the Government argues that the disputed evidence seized from the black Grand Prix would have inevitably been discovered through a routine subsequent police inventory of the vehicle.

### The Fourth Amendment

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. CONST. amend. IV. Thus, the "touchstone" of the Fourth Amendment is reasonableness. *United States v. Knights*, 534 U.S. 112, 118 (2001). "[T]he reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118-19 (citing *Wyoming v. Houghton*, 526 U.S. 295 (1999)).

### Standing

A Fourth Amendment violation may be asserted only when an individual has established legal standing to do so. *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008). To establish standing, a defendant must show that he had a reasonable expectation of privacy in the area searched. *United States v. Salvucci*, 448 U.S. 83, 90-92 (1980). For example, a possessory interest in a vehicle is sufficient to warrant a legitimate expectation of privacy in the vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978).

### A Traffic Stop

A traffic stop is a Fourth Amendment seizure of the driver, even though the purpose of the stop is limited and the resulting detention is brief. *Brendlin v. California*, 551 U.S. 249, 255 (2007). However, once the purpose of the original traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened during the stop to cause the officer to have a "reasonable and articulable suspicion" that criminal activity is afoot. *United States v. Davis,* 430 F.3d 345, 353 (6th Cir. 2005).

Generally, the decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810

(1996). Also, a police officer may conduct a traffic stop to investigate an observed act of public urination. *State v. Broom*, No. 22468, 2008 WL 4447698 at *2 (Ohio Ct. App. Oct. 3, 2008.) Finally, an officer may order a driver or a passenger out of a vehicle during a traffic stop as a precautionary measure without reasonable suspicion that either pose a safety risk. *Brendlin*, 551 U.S. at 258.

### Seizure of a Person

Generally, under the Fourth Amendment, a police seizure of a person must be supported by probable cause. *United States v. Fountain*, 2 F.3d 656, 661 (6th Cir. 1993), *overruled on other grounds by Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999). Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Further, an officer who stops a vehicle and detains its occupants seizes the occupants within the meaning of the Fourth Amendment even though the purpose of the stop is limited and the resulting detention is brief. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

However, in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court set forth an exception to the probable cause requirement for limited investigatory seizures. The exception is that an officer may stop and search an individual where the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. *Id.* at 27.

When determining whether an officer acted reasonably under such circumstances, the officer's reasonable suspicion cannot be based upon his or her "inchoate and unparticularized suspicion or hunch, but on the specific reasonable inferences which he or she is entitled to draw

from the facts in light of his or her experience. *Id.* In sum, reasonable suspicion is determined by the totality of the circumstances. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001).

A valid *Terry* stop must be "limited in scope to what is justified by the particular purposes served by the exception." *Florida v. Royer*, 460 U.S. 491, 500 (1983). To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.*

### The Search of a Vehicle

A warrantless search of an automobile is not violative of the Fourth Amendment if the search is based upon probable cause. *Carroll v. United States*, 267 U.S. 132, 149 (1925). Probable cause to conduct a warrantless search of a vehicle exists if officers have probable cause to believe that the vehicle contains contraband. *United States v. Ross*, 456 U.S. 798, 807-08 (1982). Further, the officer's probable-cause determination must be based upon facts that could justify the issuance of a warrant and not merely on the subjective good faith of the police officer. *Id.* at 808.

### Inevitable Discovery Exception

The inevitable discovery exception allows otherwise unlawfully obtained evidence to be used at trial if the Government can prove that the evidence would inevitably been acquired through lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984). The Sixth Circuit has determined that the inevitable discovery exception only applies when the Government can prove "either the existence of an independent, untainted investigation that inevitably would have been uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.

1995).

The inevitable discovery exception applies when evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first and illegal search. *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002). However, speculation as to what might have happened in the absence of the illegal search must be kept at a minimum "by focusing on demonstrated historical facts capable of ready verification or impeachment." *Id.*

## ANALYSIS

### January 30, 2013 Search

Both Bucannon and Haggins moved to suppress evidence found during the January 30, 2013 search pursuant to the Fourth Amendment. However, neither of them presented evidence from which the Court can conclude that they had standing to seek suppression pursuant to the Fourth Amendment. Therefore, their Motion To Suppress the evidence found during the January 30, 2013 search must be denied.

### May 16, 2013 Search

The events leading to the May 16, 3013 search began with Officer Reynolds stopping the black Grand Prix which Bucannon was driving and in which Haggins was a passenger. Officer Reynolds had probable cause to initiate the stop because it was reported to him by Agent Buzzard that the black Grand Prix was moving in traffic without headlights and because Agent Buzzard reported to Officer Reynolds that the driver of the black Grand Prix had urinated in a nearby park.

After initiating this traffic stop, Officer Reynolds ordered both Bucannon and Haggins to

exit the black Grand Prix with their hands up. Officer Reynolds and other officers then "secured" Bucannon and Haggins. Thus, the first question is whether the traffic stop warranted the seizure, including the "securing" of Bucannon and Haggins.

Officer Reynolds could order Bucannon and Haggins to exit the black Grand Prix. But, in order to "secure" or seize them, something must have happened during the stop to cause Officer Reynolds to have a "reasonable and articulable suspicion" that criminal activity is afoot.

The Government has presented no testimony from Officer Reynolds. Thus, the Court cannot determine that Officer Reynolds had a "reasonable and articulable suspicion" that criminal activity was afoot, that is, beyond the traffic stop. As a result, the "securing" or seizing of Bucannon and Haggins was violative of their Fourth Amendment rights.

However, there could be an exception, one that is argued by the Government in this case, termed a *Terry* stop. A *Terry* stop occurs when an officer possesses a particularized and objective basis for suspecting a particular person of criminal activity. In that situation, the officer may make a warrantless stop even if the officer lacks probable cause. As set forth earlier however, the Government has presented no testimony from Officer Reynolds. Thus, the Court cannot determine that Officer Reynolds had a "reasonable and articulable suspicion" that criminal activity was afoot when he made the traffic stop. Thus, the Government cannot use *Terry* as a reason to "secure" or seize Bucannon or Haggins.

Because the seizure of Bucannon and Haggins was violative of their Fourth Amendment rights, the search of their vehicle is also violative of their Fourth Amendment rights. However, the Government argues that the evidence found during the search of their vehicle would have inevitably been discovered through a routine subsequent police inventory of the vehicle.

The Government bases this argument on a Dayton Police Department General Order regarding Towing Motor Vehicles, a copy of which is attached to the Government's Post-Hearing Brief Concerning Defendants' Motions To Suppress. (Doc. #33.) There are at least three (3) problems with consideration of this alleged Policy. The first is that it was not submitted as evidence during the Hearing. The second is that it has not be authenticated. The third is the questionable inapplicability of the Policy. The Policy submitted indicates that it was revised "8/13." Assuming that "8/13" refers to August of 2013, the Policy that was submitted was revised after the May 16, 2013 search. If the Policy was revised at some other time, the Court has no way of knowing if it was in effect at the time of the May 16, 2013 search.

## CONCLUSION

Bucannon and Haggins did not prove standing to challenge the January 30, 2013 search. Therefore, their Motions To Suppress that search are DENIED.

The May 16, 2013 search was conducted following an illegal seizure and the Government has not proved that the evidence seized as a result of this search would have been discovered anyway. Therefore, Bucannon's and Haggins' Motions To Suppress the May 16, 2013 search are GRANTED.

**DONE** and **ORDERED** in Dayton, Ohio this Third Day of January, 2014.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record